# ARMED SERVICES BOARD OF CONTRACT APPEALS

| | |
|---|---|
| Appeal of -- | ) |
| | ) |
| Automotive Management Services | )     ASBCA No. 58352 |
| | ) |
| Under Contract No. W52P1J-11-C-0014 | ) |

APPEARANCE FOR THE APPELLANT:       James W. Kim, Esq.
                                                   McDermott Will & Emery LLP
                                                   Washington, DC

APPEARANCES FOR THE GOVERNMENT:     Raymond M. Saunders, Esq.
                                                   Army Chief Trial Attorney
                                                   MAJ Nancy J. Lewis, JA
                                                   Trial Attorney

## OPINION BY ADMINISTRATIVE JUDGE DELMAN ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

This appeal arises under a contract to Automotive Management Services (AMS or appellant) for the repair and maintenance of vehicles in Afghanistan. The parties have filed cross-motions for summary judgment, each contending it is entitled to judgment as a matter of law based upon its interpretation of the contract. According to appellant, it is entitled to reimbursement for the costs incurred to deliver Class IX spare parts from its central warehouse in Kabul to the contractually prescribed work sites in Afghanistan under contract line item number (CLIN) 0005AA, Spare Parts. According to the government, appellant is not entitled to separate reimbursement for these costs, since they are included in a firm fixed-price (FFP) effort under the provision for "supply chain management" in the Performance Work Statement (PWS) of the contract. We have jurisdiction under the Contract Disputes Act (CDA), 41 U.S.C. §§ 7101-7109.

## STATEMENT OF FACTS (SOF) FOR PURPOSES OF THE MOTIONS

1. On or about 26 November 2010, the U.S. Army Rock Island contracting center (Army or government) issued a draft solicitation for a project to provide, *inter alia*, maintenance and support to the vehicle fleet of the Ministry of Interior/Afghanistan National Police (MOI/ANP) at various maintenance locations in Afghanistan, through the Afghanistan Technical Equipment Maintenance Program (A-TEMP) (R4, tab 1).[1]

---

[1] The draft solicitation also included vehicle support for the Ministry of Defense/Afghanistan National Army (MOD/ANA). The contract before us was awarded to support the MOI/ANP only.

2. Insofar as pertinent, the draft PWS dated 26 February 2010 stated as follows:

**3.25 OBJECTIVE-THREE (3). MOI/ANP FLEET MAINTENANCE.** The contractor will be responsible for providing all the management, expertise, personnel, equipment, tools, vehicles, fuel, security, and life support to perform the requirement. The contractor shall provide equipment maintenance and supply chain management for the MOI/ANP fleet.... The supported fleet density by equipment type is defined in ANNEX 2. Required level of maintenance and locations of sites are defined in ANNEX 3.

3.25.1 **Tasks associated include the following:**

....

**3.25.1.8** *Manage a repair parts warehouse to include distribution of repair parts.*

....

**3.44 SUPPLY CHAIN MANAGEMENT.** Contractor shall provide a commercially available supply chain management system.... The contractor shall manage a supply warehouse; operate class IX parts procurement and requisitioning program. The supply chain management program shall include a viable distribution program for repair parts to each maintenance site.... *All costs of providing the warehouse facility as well as the management and personnel portion of this requirement shall be a firm-fixed price effort....*

....

**3.46 PARTS PROCUREMENT.** The contractor shall not add any costs, additional fees, mark ups, company derived inflation costs, or any other factor that changes the item's actual retail cost. For price comparison purposes, and if there is a dispute between the USG and contractor, the ACO shall determine if a source is appropriate. The requirement for premium freight costs for mission

2

essential equipment must be validated in advance by the COR. The contractor shall seek fair and reasonable prices.... The contractor shall consider freight and/or delivery fees when evaluating prices. When requesting quotes, the contractor should select suppliers who provide quality products at fair and reasonable prices and consistently deliver items on time.

(Supp. R4, tab 1 at 14, 18, 19) (Emphasis added)

3. After the draft PWS was issued, the government issued "A-TEMP INDUSTRY QUESTIONS AND ANSWERS 05 MAY 2010" (Q&As) that provided government responses to questions of potential offerors (R4, tab 15 at 17). One Q&A stated the following:

> 78. QUESTION: In section 3.2.2 [sic] of the PWS it states a direct pass through on parts, which appears to be in conflict with section 3.44 of the PWS. Is shipping approval required for mission essential parts? Are the parts/shipping CLINs FFP or T&M?
>
> ANSWER: Premium shipping cost must be approved. Established ASL will be transferred as part of GFE. *Parts/shipping are [sic] non fee bearing cost reimbursable.*

(*Id.* at 30) (Emphasis added) Neither the question nor the answer explained the term "parts/shipping." Per the Declaration of the Procuring Contracting Officer who provided the answer: "The Government was uncertain what the question was referring to." However, it was her understanding that the question sought clarification concerning the "the shipping costs to the contractor." (Govt. mot., ex. 1, ¶ 6). Per the Declaration of appellant's contract compliance officer, he relied on this Q&A and other solicitation materials to price its offer such that the shipping of parts within Afghanistan were to be paid on a cost-reimbursable basis (app. mot., ex. 1, ¶¶ 3, 4, 5).

4. On or about 15 July 2010, the government published the solicitation with a revised PWS. This PWS was again revised prior to award (R4, tab 2). While there appear to be some changes in pagination and section numbers amongst these various versions of the PWS, the parties have not brought to our attention any material differences between them with respect to the key PWS provisions above. (But we do note a post-award change to the PWS that may have significance (SOF ¶ 9, *infra*)).

3

5. AMS submitted a proposal in response to the solicitation. AMS's proposal stated as follows:

### 1.4.2.13 Parts Procurement (PWS 3.45, 3.47)

The CMSF-SCM office in Kabul will utilize our reliable international procurement channels in the Middle East, United States, Europe and Asia. This will enable us to obtain competitive prices for quality products with on-time delivery.

....

Upon arrival at the CMSF-SCM receiving area, all Class IX parts will be checked against the packing list and invoice. Parts are then sorted by location/site code[.] [D]uring this receiving process parts quality and suitability will be checked before being transferred to the designated RMC delivery line.

(Govt. mot., ex. 2 at 63) The proposal also stated:

### 1.4.2 MOI/ANP Fleet Maintenance (PWS 3.23)

We will provide all management, expertise, personnel, equipment, tools, vehicles, fuel, security and life support for a total of 22 ANP contract facilities....

Further to this, we will provide the management for a supply warehouse including procurement, storing, distribution and accountability for all spare parts used for the ANP equipment fleet.

(*Id.* at 48)

6. AMS was awarded the contract on or about 30 December 2010 (R4, tab 1). The contract was for a base period of one year with four yearly options. Per Section A – Supplemental Information, paragraph 7, appellant was allowed 90 days to mobilize and begin full performance. (*Id.*)

4

7. The contract contained CLIN 0001AA, Central Maintenance & Supply Facility, an FFP line item that provided as follows:

> CENTRAL MAINTENANCE & SUPPLY FACILITY (CMSF)
> IS AWARDED AT THE RANGE OF 18,000 - 18,999
> DENSITY OF VEHICLES IN THE AMOUNT OF
> $584,595.00 PER MONTH FOR A PERIOD OF 12 MONTHS
> FOR ONE LOCATION....

(R4, tab 1 at 6 of 81) Appellant's CMSF was located in Kabul, Afghanistan.

8. CLIN 0005AA, Spare Parts, was a cost-reimbursable line item and provided as follows:

> THIS COST REIMBURSABLE CLIN IS FOR SPARE
> PARTS IN THE AMOUNT OF $2,750,000.00 PER MONTH
> FOR A PERIOD OF 12 MONTHS....

(R4, tab 1 at 11 of 81)

9. On or about 20 April 2011, the contract was modified by Modification (Mod.) No. P00002 to incorporate a revised PWS dated 11 March 2011 (R4, tabs 4-5). Insofar as pertinent, we note that this revised PWS did not contain the language of PWS 3.25.1.8 above (SOF ¶ 2), which language was also contained in the PWS as awarded at PWS 3.23.1.8. The record is unclear as to the purpose behind this post-award change in the PWS.

10. By Mod. No. P00008 dated 24 October 2011, the government issued a "GUIDE FOR GOVERNMENT APPROVAL & OVERSIGHT OF CONTRACTOR PURCHASING & INVOICING" dated 28 September 2011 (Purchasing Guide) (R4, tab 8). The record is also unclear as to the purpose behind issuing this Purchasing Guide, and why it was issued roughly 10 months after contract award. With respect to the procurement of parts, the Purchasing Guide stated as follows:

> (v) Per the PWS, only the cost of parts or costs directly
> related to the repair and maintenance of the equipment
> that is in addition to work already included in the
> contractor's firm fixed price cost, shall be purchased
> against the spare parts CLIN in the contract. An example
> of this type of cost would be sending a part out for rebuild
> to a local shop due to this type of capability not being
> required at the EMS shop and rebuild of part is more
> beneficial to the Government than purchasing a new part.

5

> *Delivery and shipping costs are considered a cost
> associated to the part purchase.* No overhead or profit
> can be added to the parts purchase. *All other costs
> associated to parts procurement must be included in the
> cost of the contractor's firm fixed price for supply chain
> management....*

(R4, tab 8 at 19) (Emphasis added)  The Purchasing Guide did not define "Delivery and shipping costs."

11. During the course of performance, AMS completed a Parts Approval Form (PAF) to the government for review and approval of its proposed procurement of the subject spare parts. From contract inception, this form included all transportation costs for these parts, including in-country transport costs. Sometime during 2011, the government requested that in-country transportation costs be segregated from actual parts costs and documented on a Parts Approval Form – Transport Costs (R4, tab 14), where these costs were in excess of $3,000.00. (Stip. at 3)

12. It appears that the government approved all in-country transportation costs for these spare parts for some unstated period of time during the base year of the contract. (*See* PAF No. 92, dated 7 September 2011, and attachments, for container movement from Kabul to Kandahar signed by the contracting officer representative on 18 September 2011 and by the administrative contracting officer (ACO) on 21 September 2011) (R4, tab 7 at 1).

13. By email to appellant dated 10 December 2011, towards the end of the contract base year, the ACO advised that the government was disapproving transportation costs under forms T007, T008 and T009, stating as follows:

> The USG is reimbursing the freight charges for the parts that
> are coming into the [sic] Afghanistan. However, once the
> parts are in Afghanistan, the distribution of the parts in the
> country is under the supply chain management (FFP).
> According to the PWS 3.5.3 "the supply chain management
> program shall include a viable distribution program for repair
> parts to each maintenance site...."
>
> My understanding is that the USG has approved the
> transportation fees in the past. However, that will be adjusted
> accordingly with the future invoices.

(R4, tab 10)

6

14. By email to the government dated 13 December 2011, appellant objected to this disapproval, stating that "all costs for transportation were covered in the cost reimbursable CLIN for spare parts (0005)" (R4, tab 11). Appellant submitted a more detailed response to the government by email dated 10 January 2012, enclosing a letter to the government dated 10 January "2011" (sic) (R4, tab 13 at 3).

15. On 5 March 2012, the Defense Contract Audit Agency issued a "NOTICE OF CONTRACT COSTS SUSPENDED AND/OR DISAPPROVED," disapproving a total of $572,100.56 that was previously billed to the government from April 2011 through October 2011 for in-country transportation, crane rental, and container movement costs for the moving of repair parts within Afghanistan to the maintenance sites. This Notice stated these costs were included in supply chain management under the PWS which was FFP, and hence were not cost-reimbursable under CLIN 0005, Spare Parts. (R4, tab 15 at 15-16)

16. On 11 April 2012, AMS submitted a certified claim pursuant to the CDA requesting that the contracting officer (CO) issue a final decision relating to the reimbursement of these costs (R4, tab 15 at 2). The claim requested reimbursement of the disallowed invoices in the amount of $572,100.56, and AMS reserved the right to amend the amount requested since the performance under the contract was ongoing (*id.*).

17. On 12 July 2012, the CO issued a final decision denying AMS's claim (R4, tab 18 at 2). This appeal followed.

DECISION

The issue before us on summary judgment is whether appellant's costs to deliver/distribute repair parts from its central warehouse in Kabul to the regional and satellite work sites in Afghanistan are separately reimbursable under the cost-reimbursable CLIN 0005AA, Spare Parts. According to appellant, we should interpret the contract such that these costs, per the Purchasing Guide, are "Delivery and shipping" costs and are "associated to the part purchase" (SOF ¶ 10), and hence are reimbursable under CLIN 0005AA. According to the government, we should interpret the contract to the effect that these costs are part of the FFP supply chain management system under the PWS.

We believe the record is insufficiently developed to determine the reasonableness of the parties' interpretations and whether the contract was clear or ambiguous in this respect. *L-3 Services, Inc., Unidyne Div.*, ASBCA Nos. 56304, 56335, 09-2 BCA ¶ 34,156.

The evidentiary record is unclear regarding the purpose behind the issuance of the Purchasing Guide under Mod. No. P00008 in October 2011 and why it was issued roughly 10 months after award. The record also does not adequately address the extent to

7

which the government approved these now – disputed costs during the base year of the contract; whether or not said approvals were knowing and intentional, and if so, whether the parties shared, by their contemporaneous actions, a common understanding of what the contract required. The record also does not address whether the issuance of the revised PWS under Mod. No. P00002, and the Purchasing Guide under Mod. No. P00008 confirmed, or otherwise caused a change to the parties' understanding. We expect that a better developed record will address these issues, which will aid us to ascertain the appropriate contract interpretation.

## CONCLUSION

We conclude that on the present record neither party has shown entitlement to summary judgment as a matter of law. The parties' cross-motions are denied.[2]

Dated: 26 June 2014

JACK DELMAN
Administrative Judge
Armed Services Board
of Contract Appeals

I concur

I concur

MARK N. STEMPLER
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

RICHARD SHACKLEFORD
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

---

[2] The parties' cross-motions also seek various evidentiary rulings, seeking to exclude, for purposes of contract interpretation, the draft PWS, the Q&A, appellant's transportation invoices to the government and the Declarations of witnesses attached to the motions, on the basis that they are all extrinsic/parol evidence and should not be considered when the contract is "clear." Given our disposition of the motions, we need not address these evidentiary issues at this time.

8

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 58352, Appeal of Automotive Management Services, rendered in conformance with the Board's Charter.

Dated:

JEFFREY D. GARDIN
Recorder, Armed Services
Board of Contract Appeals
